**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GLAVIN IVY,** | : | **CIVIL ACTION NO. 1:18-CV-1506** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **SGT. JOHNSON, SGT. BAINEY,** | : | |
| **LT. MORTON, ERIC FULLER,** | : | |
| **RACHAEL JONES,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Plaintiff Glavin Ivy ("Ivy") commenced this action pursuant to 42 U.S.C. § 1983 alleging that his rights were violated under the First and Eighth Amendments, and under Pennsylvania state law. (Doc. 1). The action is proceeding via a second amended complaint. (Doc. 94). The remaining defendants are Sergeant Johnson, Sergeant Bainey, Lieutenant Morton, Correctional Officer Rachael Jones, and Correctional Officer Eric Fuller. Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 115). For the reasons set forth below, the motion will be granted in part and denied in part.

I.   **Factual Background & Procedural History**[1]

Ivy was transferred to the State Correctional Institution at Camp Hill,

Pennsylvania ("SCI-Camp Hill") on August 9, 2017.  (Doc. 133 ¶ 1; Doc. 145 ¶ 1).  His

time at SCI-Camp Hill was for classification purposes.  (Id. ¶ 2).  On August 17, 2017,

Ivy was moved from R Block to general population.  (Id. ¶ 3).  Beginning on August

9, 2017, Ivy submitted several requests for a law library pass.  (Doc. 94 ¶¶ 13, 20-21,

23-24, 26-28, 30-32).  On August 25, 2017, Ivy was issued a law library pass but was

only permitted a brief visit to the library.  (Id. ¶¶ 30-35).  Later that afternoon, Ivy

alleges that defendant Johnson made a derogatory statement to him about his

efforts to visit the law library.  (Id. ¶¶ 36-37).  Ivy contends that defendant Johnson

retaliated against him and exhibited hostility towards him because he was

convicted of sex crimes.  (Id. ¶¶ 38, 41).

During yard on August 25, 2017, Ivy saw defendant Johnson talking to other

inmates, who he believes threatened him on behalf of defendant Johnson.  (Id. ¶¶

39, 46, 48-49).  After yard was over, defendant Johnson allegedly moved Ivy's

---

[1]  Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the allegations in the second amended complaint and the parties' Rule 56.1 statements of material facts.  (Docs. 94, 133, 145).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

cellmate to another cell to isolate Ivy, signifying to other inmates that Ivy required
this isolation because he was either a snitch or was convicted of a sex crime.  (Id. ¶¶
40-41).  On August 27, 2017, Ivy asked a fellow inmate whether he should report
these events to a lieutenant or file a grievance.  (Id. ¶ 50).

On the evening of August 27, 2017, Ivy alleges that defendant Johnson
entered his cell, threw him against the wall, and struck him on the side of his head.
(Id. ¶¶ 52-54).  Ivy asserts that he briefly lost consciousness and suffered bleeding
from his ear.  (Id. ¶ 54).  During this assault, defendant Johnson also allegedly
verbally threatened Ivy by stating, "[y]ou're a bitch" and warned Ivy that if he ever
mentioned his name to a lieutenant or in a grievance, he would transfer Ivy to the
Restricted Housing Unit ("RHU").  (Id. ¶ 55).  Ivy believes that defendants Fuller
and Jones, who were working the control board that evening, opened the cell door
to allow defendant Johnson to enter his cell.  (Id. ¶ 53).

On August 28, 2017, Ivy submitted a grievance pertaining to, *inter alia*, the
events of August 27, 2017.  (Id. ¶ 56).  He approached defendant Morton and
informed him about the assault by defendant Johnson.  (Id. ¶¶ 57-59).  Defendant
Morton informed Ivy that he would order defendant Johnson not to communicate
with him anymore, that Ivy would be transferred to another area of the prison, and
that Ivy would be treated by medical.  (Id. ¶¶ 58-59).  A few hours later, Ivy was
transferred to the RHU.  (Id. ¶ 62).

On August 28, 2017, defendant Johnson issued a misconduct against Ivy charging him with threatening an employee.  (Id. ¶ 63).  The hearing examiner ultimately dismissed the misconduct.  (Id. ¶¶ 70, 93).

As a result of the assault on August 27, 2017, Ivy alleges that he suffered from migraines, temporary hearing loss, bleeding in his ear, impaired vision, pain and suffering, and emotional distress.  (Id. ¶¶ 65-67).  Ivy maintains that he did not receive any medical attention for his injuries.  (Id. ¶¶ 65-66, 92).

During his stay in the RHU, Ivy alleges that defendant Bainey confiscated his soap and toothpaste for one week and he was not permitted to shower from August 28, 2017 through September 11, 2017.  (Id. ¶¶ 71, 91).  He further contends that various inmates were placed in his cell to incite hostility towards him.  (Id. ¶ 86).

The Pennsylvania Department of Corrections ("DOC") has established a formal policy and procedures manual that must be followed by inmates who file grievances while incarcerated at state correctional institutions.  (Doc. 133 ¶ 4; Doc. 145 ¶ 4).  The purpose of a grievance is to allow an inmate to bring concerns and complaints to the attention of prison officials.  (Id.)  The grievance procedures are set forth in the DOC's Administrative Directive 804 ("DC-ADM 804"), titled Inmate Grievance System.  (Id. ¶ 5).  The policy provides a three-tiered system for the resolution of inmate grievances: (1) an initial review by a Grievance Officer; (2) appeal to the Facility Manager or designee; and (3) appeal to the Secretary's Office of Inmate Grievance and Appeals for final review.  (Id. ¶ 6).  Pursuant to DC-ADM 804, a grievance must be submitted in writing, using the grievance form available

4

on all housing units or blocks, within fifteen working days after the events noted in the grievance. (Id. ¶ 7). A grievance must include the following: a statement of facts relevant to the claim including the date and approximate time and location of the events giving rise to the grievance; the identity of any individuals who were directly involved in the events; any claims the inmate wishes to make concerning violations of DOC directives, regulations, court orders, or other law; and any compensation or legal relief desired. (Id. ¶ 8). Upon receipt, the Facility Grievance Coordinator assigns each grievance to a Grievance Officer. (Id. ¶ 9). If an inmate is dissatisfied with the initial response, he or she may appeal that decision to the Facility Manager. (Id. ¶ 10). The Facility Manager then provides a written response to the grievance. (Id. ¶ 11). The Facility Manager may uphold the response, uphold the inmate, dismiss the grievance as untimely or on the merits, or uphold in part and deny in part. (Id.) The Facility Manager may also remand the Initial Review Response for further investigation or consideration. (Id.) If an inmate is not satisfied with the decision of the Facility Manager, he or she may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals. (Id. ¶ 12). Only issues raised in both the original grievance and the appeal to the Facility Manager may be appealed to this level. (Id.) That appeal must include the original grievance, the Initial Response Review, the appeal to the Facility Manager, the Facility Manager's response, and the appeal to final review with any exhibits. (Id. ¶ 13). The Secretary's Office of Inmate Grievances and Appeals may then uphold the response, uphold the inmate, dismiss, or uphold in part and deny in part. (Id. ¶ 14).

Defendants contend that an inmate has not exhausted the grievance procedure unless a grievance is properly appealed to the Secretary's Office of Inmate Grievances and Appeals.  (Doc. 133 ¶ 15).  Ivy disputes whether a grievance must be properly appealed to the Secretary's Office of Inmate Grievances and Appeals in order to exhaust the grievance procedure.  (Doc. 145 ¶ 15).

In his appeal to the Secretary's Office of Inmate Grievances and Appeals, Ivy failed to provide a legible copy of his original grievance or a copy of his appeal to the Facility Manager.  (Doc. 133 ¶ 16; Doc. 145 ¶ 16).  Ivy did not remedy this deficiency after being informed of it.  (Id. ¶ 17).

## II.    Legal Standard

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F.Supp.2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F.Supp.2d at 315.

6

III.   **Discussion**

A.       **Exhaustion of Administrative Review**[2]

Defendants first contend that Ivy failed to properly exhaust his grievances in the prison's administrative review process prior to proceeding to federal court. (Doc. 135 at 17-20).  Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action concerning prison conditions.  See 42 U.S.C. § 1997e(a); Booth v. Churner, 206 F.3d 289, 291 (3d Cir. 2000).  Section 1997e(a) establishes the requirement of administrative exhaustion:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The PLRA "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).  It has been made clear that the exhaustion requirement is mandatory.  See Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth v. Churner, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement of the

---

[2]   In accordance with Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018), the court placed the parties on notice that it would consider exhaustion in its role as fact finder and afforded them the opportunity to be heard under Small v. Camden Cty., 728 F.3d 265 (3d Cir. 2013).  (Doc. 149).

PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000) (same). "[I]t is beyond the power of [any] court . . . to excuse compliance with the exhaustion requirement."  Nyhuis, 204 F.3d at 73 (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp.2d 884, 894-95 (S.D.N.Y. 1998)).

To exhaust administrative remedies an inmate must comply with all applicable grievance procedures and rules.  Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004).  The PLRA requires not only technical exhaustion of the administrative remedies, but also substantial compliance with procedural requirements.  Spruill, 372 F.3d at 227-32; see also Nyhuis, 204 F.3d at 77-78.  A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. Spruill, 372 F.3d at 227-32; see also Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000).

As stated, the Department of Corrections has an Inmate Grievance System, set forth in DC-ADM 804, which permits any inmate to seek review of problems that may arise during the course of confinement.  See 37 PA. CODE § 93.9(a); PA. DEP'T OF CORR., No. DC-ADM 804.  After an attempt to resolve any problems informally, an inmate may submit a written grievance to the Facility's Grievance Coordinator for initial review.  This must occur within fifteen days after the events upon which the claims are based.  Within fifteen days of an adverse decision by the Grievance Coordinator, an inmate may then appeal to the Facility Manager of the institution. Thereafter, within fifteen days of an adverse decision by the Facility Manager, an

inmate may file a final appeal to the Secretary's Office of Inmate Grievances and Appeals.  An appeal to final review cannot be completed unless an inmate complies with all established procedures.  An inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully exhaust an issue.  See Booth, 206 F.3d at 293 n. 2 (outlining Pennsylvania's grievance review process).

In the instant action, Ivy argues that he exhausted his remedies pursuant to DC-ADM 001.  (Doc. 147 at 8-10; Doc. 147-1 ¶¶ 3-8).  Under DC-ADM 001, an inmate "who is the victim of abuse" can report the abuse in one of three ways:

1. report it verbally or in writing to any staff member;

2. file a grievance in accordance with Department policy DC-ADM 804, "Inmate Grievance System;" or

3. report it in writing to the Department's Bureau of Investigations and Intelligence (BII).

DC-ADM 001, Inmate Abuse Policy § IV(D)(1)-(3), available at http://www/cor.state.pa.us (last accessed August 23, 2022).  DC-ADM 001 also provides for certain procedures that must be followed by the facility's Security Office when investigating allegations of abuse, which include preparing an investigative report that is then forwarded to the Bureau of Investigations and Intelligence ("BII") for review.  DC-ADM 001, Inmate Abuse Procedures Manuel § 1(C).

In the event that an inmate elects to report the alleged abuse by filing a grievance in accordance with DC-ADM 804, the allegations of abuse are still

handled in accordance with DC-ADM 001's procedures governing investigations. See DC-ADM 804 § 1(D)(2) ("A grievance dealing with allegations of abuse shall be handled in accordance with Department policy DC-ADM 001, 'Inmate Abuse.'"); see also DC-ADM 001 § 1(B)(2) ("A grievance dealing with the allegations of abuse shall be handled in accordance with this procedures manual."). As a result, the time for responding to an inmate's grievance may be extended, and the initial review response will be completed by the assigned Grievance Officer when the results of the investigation from the Bureau of Investigations and Intelligence are received. DC-ADM 804 § 1(D)(3), (5); DC-ADM 001 § 1(B)(2). However, the extension "will not alter the inmate's ability to appeal upon his/her receipt of the initial review response." Id.

Relative to this case, Ivy filed only one grievance about the events of August 27, 2017, and in it he alleged excessive force by defendant Johnson. Specifically, in grievance number 694286, Ivy stated that defendant Johnson threw him against a wall, struck him on the sides and back of his head, and verbally threatened him. (Doc. 133-2 at 49, 51). He also alleged that defendant Fuller opened his cell door to allow defendant Johnson to enter, and that defendant Jones worked on the housing unit that day. (Id.) In response to that grievance, Ivy was informed that an investigation would be conducted into his allegations of abuse. (Id. at 50). The investigation was assigned to Security Lieutenant Joe Francis who, on September 20, 2017, issued a lengthy report summarizing his findings and concluding that the allegations of abuse by excessive force and verbal threat were unfounded. (Doc. 147-2 at 33-52,

Investigation #2017-A-551).  The investigation was reviewed by Captain R. Evans.
(Id. at 33).  On October 20, 2017, the Director of the Department of Corrections
Office of Special Investigations and Intelligence, James C. Barnacle, issued his
report in which he concurred with Lieutenant Francis' findings after reviewing his
investigation.  (Id. at 53).  After conclusion of the investigation and subsequent
review, Ivy's grievance was denied on October 5, 2017.  (Doc. 133-2 at 48).  Ivy then
filed an appeal to the Facility Manager.  (Id. at 47).  The Facility Manager upheld
the initial response and denied Ivy's appeal.  (Id. at 46).  Ivy filed an appeal to the
Secretary's Office of Inmate Grievances and Appeals.  Upon review, the Chief
Grievance Officer found that Ivy's appeal was incomplete because he failed to
comply with the procedures set forth in DC-ADM 804 requiring that all relevant
documentation be provided on appeal.  (Id. at 45).  Ivy was directed to submit a
legible copy of his original grievance and a copy of his appeal to the Facility
Manager within fifteen days of the date of the decision.  (Id.)  It is undisputed that
Ivy did not comply with the directive of the Chief Grievance Officer and did not
submit the requisite documentation.  (Doc. 133 ¶¶ 16-17; Doc. 145 ¶¶ 16-17).

When faced with the interplay between the general prison grievance policy,
DC-ADM 804, and the inmate abuse reporting policy, DC-ADM 001, the Third
Circuit has declined to decide whether exhaustion of administrative remedies is
possible by reporting abuse under DC-ADM 001.  See Victor v. Lawler, 565 F. App'x

126, 129 (3d Cir. 2014).[3]  However, many courts have held that "an inmate need only file a grievance with the [Department's Office of Professional Responsibility] under DC-ADM 001 in order to exhaust administrative remedies."  Id.; see also Moore v. Lamas, No. 3:12-CV-223, 2017 WL 4180378 (M.D. Pa. Sep. 21, 2017) (proper exhaustion for the purposes of the PLRA under the DC-ADM 001 requires only reporting the abuse and waiting for the investigation to be complete); Robinson v. Tennis, No. 3:11-CV-1724, 2017 WL 4479349 (M.D. Pa. Sep. 8, 2017) (inmate properly exhausted by reporting abuse under DC-ADM 001 and filing grievance under DC-ADM 804, even though inmate did not appeal unfavorable determination).

Accordingly, we find that Ivy properly exhausted his claim for excessive force under DC-ADM 001.  Defendants' motion for summary judgment based on failure to exhaust administrative remedies will be denied.

   **B.    Constitutional Claims**

      **1.    *Qualified Immunity***

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

_____

   [3]  The court acknowledges that nonprecedential decisions are not binding upon federal district courts.  Citations to nonprecedential decisions reflect that the court has carefully considered and is persuaded by the panel's *ratio decidendi*.

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

The doctrine of qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted. Pearson v. Callahan, 555 U.S. 223, 244-45 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. at 231. "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) (citing Pearson, 555 U.S. at 244). The burden to establish qualified immunity rests with the defendant claiming its protection. Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established" at the time of the alleged violation. Saucier v. Katz,

13

533 U.S. 194, 201 (2001), overruled in part by Pearson, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two Saucier prongs should be addressed first). Here, we find that there are genuine issues of material fact with respect to certain First and Eighth Amendment claims. Thus, granting summary judgment on the basis of qualified immunity would be inappropriate. This claim will proceed.

### 2.   *Claims against Defendants Fuller, Jones, and Morton*

Individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the operation of respondeat superior." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998)). "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207-08; see also Rizzo v. Goode, 423 U.S. 362 (1976); Atkinson v. Taylor, 316 F.3d 257 (3d Cir. 2003). Such allegations, however, must be made with appropriate particularity in that a complaint must allege the particulars of conduct, time, place, and person responsible. Evancho, 423 F.3d at 354; Rode, 845 F.2d at 1207-08. Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. Rode, 845 F.2d at 1208. A claim of a constitutional deprivation cannot be premised

merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred. Id. at 1207.

Supervisors "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Iqbal, 556 U.S. at 676. With respect to supervisory liability, there are two theories: "one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." Santiago v. Warminster Twp., 629 F.3d 121, 129 n.5 (3d Cir. 2010 (quotation and alteration marks omitted).

Ivy asserts that defendants Fuller and Jones purposefully opened his cell door to enable defendant Johnson to enter and assault him. (Doc. 94 ¶ 53; Doc. 133-2 at 49, 51). At his deposition, Ivy testified regarding the roles of defendants Jones and Fuller as follows:

> As for John Doe and Jane Doe, which I think what we now know as Eric Fuller and Mrs. Jones, I think her name was, but they opened the cell door. Somebody had to have opened the cell door in the—behind the controls. Because—and the reason why I know this is because of the time that it took for the cell door to open and for Sergeant Johnson to enter the cell, which was a mere second. I would say not any more than three seconds. And for that to occur, he obviously couldn't have opened the door himself, somebody else had to have opened the door. So they obviously were in conspiracy with Sergeant Johnson and allowed for this assault to occur.

(Doc. 133-1, Deposition of Glavin Ivy ("Ivy Dep.") at 83, Notes of Transcript ("N.T.") 82:5-19). Ivy surmises that "[b]ecause of how quickly Sgt. Johnson entered the cell after the cell gate opened, which were mere seconds, it is evident that C.O. Eric Fuller and C.O. Rachael Jones, who were stationed on the C-Block that night and were working the control board . . . opened Plaintiff's cell for Sgt. Johnson to enter." (Doc. 94 ¶ 53). In support of his contention that defendants Jones and Fuller opened his cell door, Ivy relies almost entirely on his sworn declaration. (Doc. 147-1). While Ivy's declaration amounts to little more than a recitation of the allegations in his second amended complaint, it is "an admissible form of evidence used to support factual positions during summary judgment." Shelton v. Bledsoe, 522 F. App'x 109, 112 (3d Cir. 2013) (*per curiam*) (citing FED. R. CIV. P. 56(c)). The United States Court of Appeals for the Third Circuit has "consistently said that a pro se inmate, like [Ivy], 'is in a decidedly difficult position from which to generate record evidence' and that affidavits 'are about the best that can be expected' at the summary judgment stage." Id. (quoting Brooks v. Kyler, 204 F.3d 102, 108 n.7 (3d Cir. 2000); citing Smith v. Mensinger, 293 F.3d 641, 649 n.4 (3d Cir. 2002)). Thus, we must accept the declaration as an admissible form of evidence used to support Ivy's factual positions. Ivy's claims against defendants Fuller and Jones will proceed.

With respect to defendant Morton, Ivy asserts that he approached defendant Morton in the dining hall and informed him that he was assaulted by defendant Johnson. (Doc. 133-1 at 58, Ivy Dep. N.T. 57:1-11). After lunch, defendant Morton and Ivy spoke extensively about the incident. (Id. at 58, Ivy Dep. N.T. 57:12-21).

Defendant Morton told Ivy that he would order defendant Johnson not to communicate with him anymore, that Ivy would be transferred to another area of the prison, and that Ivy would be treated by medical. (Id. at 58-61, Ivy Dep. N.T. 57:18-60:9). The record confirms that Ivy was transferred to the RHU on August 28, 2017, and he never saw defendant Johnson after the alleged assault on August 27, 2017. (Id. at 59-60, 67, Ivy Dep. N.T. 58:22-59:11, 66:16-25). However, Ivy asserts that he did not receive any medical attention for his injuries, "as promised by Lt. Morton." (Doc. 94 ¶ 65). The court will deny defendants' motion on the basis that defendant Morton lacked personal involvement in the alleged wrongs.

### 3.    *Eighth Amendment Claims*

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners. See Wharton v. Danberg, 854 F.3d 234, 247 (3d Cir. 2017). There are several types of Eighth Amendment claims, including claims alleging: denial of, or inadequate access to, medical care; exposure to adverse conditions of confinement; the use of excessive force; and failure to protect from assaults by other inmates. An Eighth Amendment claim includes both objective and subjective components. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Under the objective prong, the court must consider "if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Hudson v. McMillian, 503 U.S. 1, 8 (1992) (quoting Wilson, 501 U.S. at 298). However, "[w]hat is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause depends upon the claim at issue." Id. The subjective component is met if the

17

person or persons causing the deprivation acted with "a sufficiently culpable state of mind." Wilson, 501 U.S. at 298.

### a.   **Excessive Force Claim**

Defendants state that "if the allegation of a physical assault of Plaintiff by Defendant Johnson were true, which is denied, such a claim would be stated." (Doc. 135 at 22 n. 3).  Regardless, defendants argue that this claim cannot stand because Ivy failed to exhaust his administrative remedies with respect to this claim, and defendants Fuller and Jones lack personal involvement.  (Id.)  As set forth herein, Ivy has properly exhausted his excessive force claim, and the claims against defendants Jones and Fuller will proceed at this stage of the litigation.  Moreover, defendants have not moved for summary judgment on the merits of the excessive force claim.  Hence, this claim will proceed.

### b.   **Conditions of Confinement Claim**

In order to succeed on a claim as to one's conditions of confinement, a plaintiff must establish that: "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2015).  "[T]he Constitution does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. 337, 349 (1981).  Therefore, conditions of imprisonment violate the Eighth Amendment only if they, "alone or in combination . . . deprive inmates of the minimal civilized measures of life's necessities." See id. at 347.  Such necessities

include "adequate food, clothing, shelter, and medical care." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994).  Thus, "extreme deprivations are required to make out a conditions-of-confinement claim." <u>Hudson</u>, 503 U.S. at 9.  However, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." <u>Mammana v. Fed. Bureau of Prisons</u>, 934 F.3d 368, 372 (3d Cir. 2019) (quoting <u>Wilson</u>, 501 U.S. at 304 and <u>Rhodes</u>, 452 U.S. at 347).

Ivy asserts that defendant Bainey denied him hygiene products for one week and the ability to shower from August 28, 2017 through September 11, 2017.  (Doc. 94 ¶¶ 71, 91; Doc. 147-1 ¶ 54).  However, the averments contained in Ivy's second amended complaint are contradicted by his deposition testimony, where he was unable to identify any individuals who denied him the opportunity to shower.  (Doc. 133-1 at 73-75, Ivy Dep. N.T. 72:18-74:4-21).  At his deposition, defense counsel asked Ivy the following question: "So these—the specific correctional officers that denied your showers, you don't know who they are?"  (<u>Id.</u> at 75, N.T. 74:18-20).  In response, Ivy stated: "No, but they knew who I was." (<u>Id.</u> at 75, N.T. 74:21).  There is simply no evidence indicating that defendant Bainey was on duty when Ivy was denied shower access and Ivy does not aver that he suffered any harm from these potentially unsanitary conditions.  Rather, he contends that there was simply a "risk of harm." (Doc. 14 at 22).  The court is cognizant that the conditions of which Ivy complains, particularly the denial of shower access for two weeks, is quite close to

the level of an Eighth Amendment violation.  Nevertheless, we conclude that, while potentially unpleasant, Ivy has failed to establish that he was deprived of "the minimal civilized measure of life's necessities."  <u>Wilson</u>, 501 U.S. at 298; <u>see also</u> <u>Barndt v. Wenerowicz</u>, 698 F. App'x 673, 677 (3d Cir. 2017) (concluding that the denial of showers for twenty-eight days did not rise to the level of an Eighth Amendment violation); <u>Adderly v. Ferrier</u>, 419 F. App'x 135, 140 (3d Cir. 2011) (holding that denial of access to clothing, toiletries, legal mail, a pillow, a mattress, and showers for seven days did not "constitute a denial of the 'minimal civilized measures of life's necessities'") (quoting <u>Williams v. Delo</u>, 49 F.3d 442, 444-47 (8th Cir. 1995)); <u>Lindsey v. Shaffer</u>, 411 F. App'x 466, 468 (3d Cir. 2011) (*per curiam*) (concluding that whether plaintiff suffered harm was critical to determination of whether unsanitary conditions were unconstitutional); <u>Fortune v. Hamberger</u>, 379 F. App'x 116, 122 (3d Cir. 2010) (concluding that the denial of showers for fifteen days did not violate the Eighth Amendment when the inmate-plaintiff did not "suffer[ ] any harm as a result of the denial of additional showers").  The court, therefore, will grant summary judgment in favor of defendants with respect to Ivy's Eighth Amendment claim concerning his conditions of confinement.

### c.      <u>Verbal Threats</u>

Ivy asserts that defendant Johnson was verbally abusive during the physical assault on August 27, 2017.  Defendant Johnson allegedly stated, "[y]ou're a bitch" and warned Ivy that if he ever mentioned his name to a lieutenant or in a grievance, he would transfer Ivy to the RHU.  (Doc. 94 ¶ 55; Doc. 133-1 at 46-47, 52, Ivy Dep.

N.T. 45:24-46:4, 51:3-7).  If defendant Johnson's alleged statements to Ivy were not accompanied by physical injury, they would not amount to malicious behavior violative of the Eighth Amendment.  See Dunbar v. Barone, 487 F. App'x 721, 723 (3d Cir. 2012) ("[V]erbal threats or taunts, without more, are not sufficient to constitute a violation of the Eighth Amendment."); Quiero v. Muniz, No. 14-225, 2015 WL 13738994, at *5 (M.D. Pa. Aug. 3, 2015) ("Allegations of verbal abuse or threats, unaccompanied by injury or damage, are not cognizable under § 1983, regardless of whether the inmate is a pretrial detainee or sentenced prisoner."). Section 1997e(e) of Title 42 provides: "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  More than a *de minimis* physical injury must be alleged as a predicate to allegations of mental or emotional injury.  See Mitchell v. Horn, 318 F.3d 523, 536 (3d Cir. 2003).  In addition to the verbal abuse, Ivy also asserts that defendant Johnson slammed him against a wall and struck him in the head, causing him to temporarily lose consciousness.  (Doc. 94 ¶ 54).  He contends that he suffered pain, migraines, vision impairment, and bleeding from his ear. (Doc. 133-1 at 54, Ivy Dep. N.T. 53:5-17).  Based on the foregoing, defendants' motion for summary judgment will be denied with respect to this claim.

### d.    Failure to Intervene Claim

Defendants have construed Ivy's second amended complaint as asserting a failure to intervene claim.  (Doc. 135 at 25-26).  To prevail on a failure to intervene

claim, plaintiff must show: "(1) that the defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a 'realistic and reasonable opportunity to intervene.'" Knight v. Walton, No. 2:12-CV-984, 2014 WL 1316115, at *8 (W.D. Pa. Mar. 28, 2014) (quoting Smith v. Mensinger, 293 F.3d 641, 651 (3d Cir. 2002)) (citation omitted). The Third Circuit Court of Appeals has held that a corrections officer who fails to intervene when other officers are beating an inmate may be liable on a failure-to-protect claim if the officer had "a realistic and reasonable opportunity to intervene" and "simply refused to do so." Smith, 293 F.3d at 650-51.

Ivy maintains that defendant Johnson acted alone, he testified that no one was nearby when he was assaulted by defendant Johnson (other than fellow inmates in their cells), and his deposition testimony does not identify any prison officials who purportedly failed to intervene. (Doc. 94 ¶ 54; Doc. 133-1 at 56-57, Ivy Dep. N.T. 55:23-56:12; Doc. 147-1 ¶ 29). Additionally, in his brief in opposition to defendants' motion for summary judgment, Ivy does not even address the failure to intervene claim. (See Doc. 147). Therefore, defendants' motion for summary judgment will be granted with respect to any potential failure to intervene claim.

### e.    Deliberate Indifference to Medical Needs

In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court held that prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical needs. Id. at 104-05. To succeed on such a claim, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately

22

indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'" Pearson v. Prison Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (alteration in original) (quoting Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).

Deliberate indifference occurs when prison officials "intentionally deny[ ] or delay[ ] access to medical care or interfer[e] with the treatment once prescribed." Pearson, 850 F.3d at 534 (quoting Estelle, 429 U.S. at 104-05). A mere complaint "that a physician has been negligent in diagnosing or treating a medical condition does not state a valid [constitutional] claim of medical mistreatment[.]" Estelle, 429 U.S. at 106. Moreover, "mere disagreement as to the proper medical treatment does not support a claim of" deliberate indifference. Pearson, 850 F.3d at 535 (internal quotations omitted); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3rd Cir.1987). Rather, where there has been medical care, "we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." Id. As long as a physician exercises professional judgment, his or her behavior does not violate a detainee's constitutional rights. See Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).

Ivy sets forth a deliberate indifference claim against defendant Morton for failing to refer him to medical personnel for treatment of the injuries sustained in the assault on August 27, 2017. In response, defendants argue that Ivy failed to establish that he suffered from serious medical needs and that he had no visible

injuries.  (Doc. 135 at 26-27).  They have submitted a video of Ivy's escort to the RHU the day after his alleged assault in support of their contention that Ivy did not have any noticeable injuries.

Generally, a court must take the facts in the light most favorable to the non-moving party when disposing of a summary judgment motion.  However, a "limited exception" to this general rule exists where the non-movant's version of the events may be disregarded to the extent those facts are "blatantly contradicted" by the summary judgment record.  Scott v. Harris, 550 U.S. 372, 380 (2007).  While video footage has been found to establish this "limited exception," not all video footage or mechanical depictions will allow a court to disregard the non-movant's version of the events.  See Scott, 550 U.S. at 380; Patterson v. City of Wildwood, 354 F. App'x 695, 697-98 (3d Cir. 2009) ("courts have declined to apply the limited exception set forth in Scott v. Harris where a videotape or other mechanical depiction does not capture the whole incident or the entire arrest, or where the videotape or mechanical depiction is susceptible to multiple reasonable interpretations.").  Here, the record is currently devoid of the type of evidence that is capable of blatantly contradicting Ivy's version of the events in his sworn declaration so that no reasonable jury could believe it.  There are genuine issues of material fact with regard to whether defendant Morton was deliberately indifferent to Ivy's medical needs in failing to refer him for medical treatment after the alleged physical assault on August 27, 2017.  The claim will proceed as to this defendant.

**4.   *First Amendment Retaliation Claim***

Ivy sets forth a retaliation claim against defendant Johnson based on the assault and the filing of a false misconduct.  He also asserts a retaliation claim against defendant Bainey based on the denial of hygiene products and showers.  The First Amendment offers protection for a wide variety of expressive activities.  See U.S. CONST. amend I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  See Turner v. Safley, 482 U.S. 78, 89 (1987).  Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment.  See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).

To prevail on a retaliation claim, Ivy bears the burden of demonstrating three elements.  First, he must prove that he was engaged in a constitutionally protected activity.  See Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  Second, he must demonstrate that he "suffered some 'adverse action' at the hands of prison officials."  Id. (quoting Allah, 229 F.3d at 225).  This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights."  Id. (quoting Suppon v. Dadonna, 2013 F.3d 228, 235 (3d Cir. 2000)).  Significantly, the effect of the adverse action must be more than *de minimis*.  McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006).  Third, he is required to show that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision" to take action against him.  Rauser, 241 F.3d at

25

333-34 (quoting <u>Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977)).

If a prisoner establishes a prima facie case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." <u>Rauser</u>, 241 F.3d at 334. "This is often referred to as the 'same decision defense.'" <u>Watson v. Rozum</u>, 834 F.3d 417, 422 (3d Cir. 2016). If the prison officials can make this showing, it defeats the retaliation claim. See <u>Carter v. McGrady</u>, 292 F.3d 152, 159 (3d Cir. 2002).

### a.      **Defendant Johnson**

Ivy avers that defendant Johnson assaulted him in retaliation for discussing the filing of a grievance with another inmate. (Doc. 147 at 19-20). While the filing of an inmate grievance certainly constitutes a constitutionally protect activity, here, Ivy does not claim that he was retaliated against for filing a grievance. See <u>Fantone v. Latini</u>, 780 F.3d 184, 192 n.8 (3d Cir. 2015) ("The filing of a prison grievance is an activity protected by the First Amendment."). Rather, Ivy asserts that merely talking to another inmate about filing a grievance triggered the alleged retaliatory act. Ivy's conversation with another inmate about filing a grievance may be considered constitutionally protected activity. See <u>Eichenlaub v. Twp. of Indiana</u>, 385 F.3d 274, 282-83 (3d Cir. 2004) ("All speech is protected by the First Amendment except narrow categories that are entitled to no protection, including obscenity and 'fighting words.'"). Ivy has thus satisfied the first <u>Rauser</u> prong. With respect to the

26

second prong of the <u>Rauser</u> test, an inmate assault by a correctional officer constitutes adverse action "sufficient to deter a person of ordinary firmness from exercising his [First Amendment] rights." <u>Rauser</u>, 241 F.3d at 333.  The court must next determine whether there is a causal connection between the exercise of the constitutional right and the adverse action.  Ivy has established an "unusually suggestive" temporal proximity between his protected conduct and the defendant's adverse action to support an inference of retaliatory motive: defendant Johnson allegedly assaulted Ivy several hours after Ivy spoke to a fellow inmate about filing a grievance.  (Doc. 94 ¶¶ 50-55).  Ivy has met prong three.

As stated, if the prisoner establishes a prima facie case of retaliation, as is the case here, the burden then shifts to prison officials to show by a preponderance of the evidence that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." <u>Rauser</u>, 241 F.3d at 334.  Defendants have not presented any evidence to demonstrate that defendant Johnson's alleged acts were reasonably related to a legitimate penological interest.  Summary judgment will be denied as to this retaliation claim against defendant Johnson.

Ivy also asserts that defendant Johnson issued a false misconduct against him in retaliation for filing a grievance and reporting the assault to defendant Morton.  This resulted in his placement in the Restricted Housing Unit.  The filing of a grievance is an activity protected by the First Amendment and the issuance of a misconduct report constitutes adverse action as it carries with it more than *de*

27

*minimis* consequences. See Watson, 834 F.3d at 417, 422; Mitchell, 318 F.3d at 530 ("[plaintiff]'s allegation that he was falsely charged with misconduct in retaliation for filing complaints against [a corrections officer] implicates conduct protected by the First Amendment"); see also Allah, 229 F.3d at 225 (transfer to administrative custody constitutes adverse action). The court must next determine whether there is a causal connection between the exercise of the constitutional right and the adverse action. Again, Ivy has established an "unusually suggestive" temporal proximity between his protected conduct and the defendant's adverse action to support an inference of retaliatory motive because defendant Johnson issued Ivy the misconduct on August 28, 2017, the same day Ivy filed his grievance. (See Doc. 147-2 at 18-20; see also Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 759 n.15 (3d Cir. 2019) ("ample evidence" existed "from which a reasonable juror could conclude that a causal link existed" when the protected activity and adverse action occurred within one week)). Ivy has satisfied the three Rauser prongs. The burden now shifts to the prison officials. Rauser, 241 F.3d at 334.

When "evaluating the legitimacy of a misconduct report, [the court] considers 'the quantum of evidence of the misconduct to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion [the court] must afford them.'" Williams v. Folino, 664 F. App'x 114, 148-149 (3d Cir. 2016) (not precedential) (quoting Watson, 834 F.3d at 426). Here, the evidence confirms that the hearing examiner ultimately dismissed the misconduct charge against Ivy. (Doc. 147-2 at 20, 23-24, 28-29). Defendants have

not satisfied their burden; they have not presented a sufficient quantum of evidence of misconduct to demonstrate that the discipline imposed was reasonably related to a legitimate penological interest, and that Ivy would have been disciplined regardless of the filing of the grievance.  Consequently, summary judgment will be denied as to this retaliation claim.

### b.    <u>Defendant Bainey</u>

Ivy next avers that defendant Bainey deprived him of life's basic necessities and issued a false misconduct against him "for succeeding in his defense against Sgt. Johnson's misconduct" and "in furtherance of Sgt. Johnson's retaliation." (Doc. 147 at 19-20).  While Ivy complains of these retaliatory acts, he fails to assert that he was involved in any constitutionally protected activity when defendant Bainey allegedly retaliated against him.  Instead, Ivy implies that defendant Bainey's retaliation is based on the protected conduct that prompted defendant Johnson to retaliate against him.  Courts have consistently rejected retaliation claims "against one defendant based on [protected activity] against another [individual]" for lack of retaliatory motive.  <u>Victor v. Lawler</u>, 2010 WL 5014555, at *5 (M.D. Pa. Dec. 3, 2010), <u>aff'd</u>, 565 F. App'x 126 (3d Cir. 2014); <u>see also</u> <u>Evans v. Rozum</u>, 2009 WL 5064490, at *22 (W.D. Pa. Dec. 17, 2009) ("There is no apparent reason why [the moving defendants] would want to retaliate against Plaintiff for filing a lawsuit against others."); <u>Royster v. Beard</u>, 308 F. App'x 576, 579 (3d Cir. 2009) (affirming summary judgment in favor of defendant on plaintiff's claim that he was retaliated against by a defendant who was not the target of his protected

activity).  Ivy fails to clear the first <u>Rauser</u> hurdle in that he has not established that

he was engaged in constitutionally protected activity at the time of defendant

Bainey's alleged retaliatory conduct.  Defendant Bainey is entitled to an entry of

summary judgment on this claim.

###### C.      **State Law Claims**

######## 1.      ***Sovereign Immunity***

Defendants seek an entry of summary judgment on Ivy's state law tort claims

of assault and battery, and intentional infliction of emotional distress, arguing that

the doctrine of sovereign immunity bars these claims against state employees.

(Doc. 135 at 34-35).  We agree.  It is beyond dispute that, "[t]he Department of

Corrections is an agency of the Commonwealth and the defendants, as employees of

an agency of the Commonwealth, are entitled to the protection afforded by

sovereign immunity."  <u>McGrath v. Johnson</u>, 67 F.Supp.2d 499, 511 (E.D. Pa. 1999)

(citing <u>Maute v. Frank</u>, 441 Pa. Super. 401, 402, 657 A.2d 985, 986 (1995) (state prison

officials enjoy sovereign immunity); <u>Robles v. Pennsylvania Dep't of Corrections</u>,

718 A.2d 882, 884 (Pa. Commw. Ct. 1998) (same)), <u>aff'd</u>, 35 F. App'x 357 (3d Cir. 2002).

As a general matter, subject only to nine specific statutory exceptions not applicable

here, this sovereign immunity bars state law tort claims like those alleged here,

since Commonwealth employees are immune from liability for either negligence or

intentional torts.[4] McGrath, 67 F.Supp.2d at 511, aff'd, 35 F. App'x 357 (3d Cir.

2002).  Defendants are entitled to an entry of summary judgment on the state law

tort claims.

>    2.    *Civil Conspiracy Claim*

Ivy asserts a civil conspiracy against defendants Johnson and Morton for

acting in a common purpose to retaliate against him and cover-up the assault.  (Doc.

147 at 26).  Under Pennsylvania law, to establish a prima facie case of civil

conspiracy, a plaintiff must plead and prove: (1) a combination of two or more

persons acting with a common purpose to do an unlawful act or to do a lawful act by

unlawful means or for an unlawful purpose; (2) an overt act in furtherance of the

conspiracy; and (3) actual legal damages.  Deitrick v. Costa, No. 4:06-CV-1556, 2015

WL 1606714, at *9 (M.D. Pa. April 9, 2015) (citing Goldstein v. Phillip Morris, Inc.,

854 A.2d 585, 590 (Pa. Super. 2004).  Proof of malice, defined as an intent to injure, is

required.  Reading Radio, Inc. v. Fink, 833 A.2d 199, 212 (Pa. Super. 2003).  The

unlawful intent must be without justification.  Thompson Coal Co. v. Pike Coal Co.,

412 A.2d 466, 472 (Pa. 1979).  The elements of civil conspiracy may be proven

circumstantially, so long as the evidence is "full, clear and satisfactory."  Rumbaugh

---

[4] The nine categories for which sovereign immunity will not apply are: (1) vehicles in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions; (3) the care, custody, or control of personal property; (4) a dangerous condition of Commonwealth agency real estate and sidewalks; (5) dangerous conditions of highways created by potholes or sinkholes; (6) the care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines.  See 42 PA. CONS. STAT. ANN. § 8522(b).

v. Beck, 601 A.2d 319, 327 (Pa. Super. 1991).  A plaintiff cannot rely on subjective suspicions and unsupported speculation.  Young v. Kann, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991).

Here, Ivy's vague and conclusory allegations of conspiracy fail to satisfy the specific pleading requirements set forth above.  He contends that defendant Johnson removed Ivy's cellmate so he would not witness the assault, defendant Morton failed to complete the incident report and failed to contact the medical department, and Lieutenant Francis failed to preserve the video footage.  (Doc. 147 at 25-26).  The various conspiracies identified are conclusory and speculative in nature and lack the requisite specificity.  Ivy, as the adverse party, must raise "more than a mere scintilla of evidence in its favor" and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989).  Ivy fails to come forward with evidence of a civil conspiracy between defendants Johnson and Morton.  Because Ivy fails to meet his burden, defendants are entitled to an entry of summary judgment on this claim.

## IV.   Conclusion

Defendants' motion (Doc. 115) for summary judgment will be granted in part and denied in part.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:      August 24, 2022